**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOSE L. ECHAVARRIA,
*Petitioner-Appellee/*
*Petitioner-Appellant*,

v.

TIMOTHY FILSON, Warden; ADAM
PAUL LAXALT, Attorney General,
*Respondents-Appellants/*
*Respondents/Appellees.*

Nos. 15-99001
17-15560

D.C. No.
3:98-cv-00202-
MMD-VPC

OPINION

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, District Judge, Presiding

Argued and Submitted December 6, 2017
Pasadena, California

Filed July 25, 2018

Before: William A. Fletcher, Marsha S. Berzon,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge W. Fletcher

**SUMMARY**<sup>*</sup>

**Criminal Law**

The panel affirmed the district court's grant of habeas corpus relief to Jose Echavarria, who was convicted and sentenced to death for killing FBI Special Agent John Bailey.

Echavarria claimed that there was a constitutionally intolerable risk of bias, based on the fact that several years earlier Agent Bailey had investigated for possible criminal prosecution Nevada District Judge Jack Lehman, who presided over Echavarria's trial.

The panel reviewed the Nevada Supreme Court's decision *de novo*, rather than with AEDPA deference, because the Nevada Supreme Court adjudicated only Echavarria's claim of actual bias, not his distinct claim of risk of bias.

The panel held that Echavarria's right to due process was violated because for an average judge in Judge Lehman's position there would have been a constitutionally intolerable risk of bias.

---

**\*** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jeffrey Morgan Conner (argued), Deputy Attorney General; Adam Paul Laxalt, Attorney General; Carson City, Nevada, for Respondents-Appellants/Appellees.

Randolph Fiedler (argued), Sylvia A. Irvin, and Michael Pescetta, Assistant Federal Public Defenders; Rene Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Petitioner-Appellee/Appellant.

**OPINION**

W. FLETCHER, Circuit Judge:

In this capital case, the State of Nevada appeals from a grant of habeas corpus to Petitioner Jose Echavarria. Echavarria was convicted and sentenced to death for killing an agent of the Federal Bureau of Investigation ("FBI"). Several years earlier, that same FBI agent had investigated for possible criminal prosecution the judge who presided over Echavarria's trial. Echavarria was never told of the connection between the FBI agent and the judge. The district court held that this unrevealed connection violated due process by creating a constitutionally intolerable risk of judicial bias. We agree.

## I. Factual Background

According to the evidence presented at trial, Echavarria attempted to rob a Las Vegas bank on June 25, 1990. FBI Special Agent John Bailey was at the bank on unrelated FBI

business. Echavarria tried to rob a teller at gunpoint. The teller screamed, and Echavarria abandoned the robbery attempt. As Echavarria walked toward the bank's front door, Agent Bailey drew his gun, identified himself as an FBI agent, and ordered Echavarria to stop. Echavarria continued walking. Agent Bailey fired a shot that shattered the glass in the door. Echavarria stopped and, at Agent Bailey's orders, dropped his gun. Agent Bailey frisked Echavarria and asked a bank employee to retrieve handcuffs from Agent Bailey's car.

Before Echavarria could be handcuffed, he knocked Agent Bailey to the ground. Echavarria retrieved his gun and shot Agent Bailey three times. Echavarria then ran out of the bank and got into a car in which his getaway driver, Carlos Gurry, was waiting. Gurry was apprehended by Las Vegas police that afternoon. Echavarria drove the getaway car to Juarez, Mexico, arriving there early the next morning.

### A. FBI Assistance to the Prosecution

The FBI immediately launched an investigation. FBI Agent Alvaro Cruz testified at a suppression hearing in state court that he agreed that the case was of "great importance" to his office "because of the fact that it was a special agent of the FBI, who was a victim of this homicide."

On the morning of June 26, the FBI contacted Jose Rubalcava, Commandante of the Chihuahua State Judicial Police in Juarez, Mexico, to ask for his assistance in locating and arresting Echavarria. Commandante Rubalcava, who had a long-standing cooperative arrangement with the FBI, assigned twenty-eight agents to the task. Mexican authorities arrested Echavarria that night at about 8:30 pm at the Juarez

airport and took him to the Juarez police station. After learning of Echavarria's arrest, four agents from the FBI's El Paso office, including Agent Cruz, drove across the border, arriving at the Juarez police station at about 11:00 pm.

Echavarria signed a confession the next morning. Before trial, he moved for suppression of his confession, alleging that it was obtained by torture.

Oren Gordon, a former employee of the Drug Enforcement Administration with experience working along the U.S.-Mexico border, testified at the hearing on Echavarria's suppression motion:

> Q: And what was the general reputation of law enforcement agents in Mexico, for the use of physical abuse and torture, to obtain statements from suspects and witnesses?
>
> A: It was a common occurrence. It was a regular technique used to entice the person or induce the person to say what they wanted him to say . . . .

Gordon testified further that Mexican authorities used electrical devices to administer shocks during interrogations. He testified that devices with transformers, characterized by a humming sound when turned on, generally did not leave marks.

Agent Manuel Marquez, one of the four FBI agents who drove to Juarez, denied knowing this general reputation. When asked whether Mexican law enforcement authorities

have a "reputation among law enforcement agents, with whom you interface, as obtaining statements through torture or physical abuse," he responded, "Within the law enforcement community, no." When asked about the reputation "within the community in Juarez and El Paso," Agent Marquez responded, "Yes."

Echavarria testified at the suppression hearing that he was tortured by the Mexican police. According to Echavarria, police officers hit him while he was in the car on the way from the airport to the police station. When they arrived at the station, he was taken to the "Commandante," who advised him to cooperate, or else Maria, Echavarria's former girlfriend who had helped him when he arrived in Juarez, "would be paying the consequences." When Echavarria refused to cooperate, he was taken to the second floor of the police station, where his clothes were taken off. He was told to spread his legs. The Mexican police beat him in the face, using an open hand to avoid leaving marks, and between the legs. After about an hour or an hour and a half, Echavarria was clothed and taken back down to the first floor. He was put in a room with the Commandante and two FBI agents, one of whom spoke Spanish. The agents "asked me then if I was ready to make a confession." When Echavarria refused, the Commandante "told his agent to take [Echavarria] upstairs to the second floor again."

Once back on the second floor, Echavarria was again stripped. This time, he was blindfolded. He was again beaten in the face and between the legs. He heard someone cock a gun next to his ear, and then felt the gun pressed against his head. Echavarria was told he would be shot and thrown in the river. Next, he heard what sounded like a welding machine being turned on, and the officers shocked

Echavarria's "private parts." They kept asking "[i]f I was ready to make a confession."

Echavarria was then taken down to the first floor, where "there was a tall white hair man who was a FBI of the United States . . . [who] would ask me again whether I was going to cooperate with them." Echavarria was also taken to the basement, where his former girlfriend Maria and her sister were being held. Police officers threatened to beat Maria and "tighten her nipples, the breast nipples," and do other "obscene things" to her.

Having been brought "up to the second floor twice and . . . once down to the cell downstairs," Echavarria signed a confession. He testified that he did so because "I had no alternative."

The prosecution called as witnesses at the suppression hearing two of the four FBI agents who had driven together to Juarez. Agent Cruz testified that he and the other agents met with Commandante Rubalcava and several other Mexican police officers, and that Echavarria was brought into the room. Agent Cruz testified that they interviewed Echavarria for about thirty minutes. He also testified that none of the four FBI agents who went to Juarez had white hair. Agent Marquez estimated that the interview took thirty to forty minutes. He testified that he gave *Miranda* warnings to Echavarria orally, but that Echavarria did not sign the usual FBI form acknowledging the warnings because the FBI agents did not have the form with them.

Agents Cruz and Marquez both testified that they saw no marks on Echavarria or other indications of physical abuse, and that they never saw Echavarria again that night. Agent

Cruz testified, "I believe that we just went back to our car and came back to El Paso."

Echavarria's confession, signed at about 11:00 am the next morning, stated:

> He then walked and entered the bank and went towards the tellers booths of the bank, he approached one of them which was being tended by a woman whom he knows was named CANY VELAZQUEZ and once in front of her, the declarant took the pistol and showed it to the teller already mentioned telling her in English "I have a gun in the hand, give me the money" . . . .

> [T]he FBI agent approached him with his pistol on the hand ordering the declarant to leave his weapon on the floor of the bank and declarant put his pistol on the floor so that afterwards, the FBI agent proceeded to put his pistol in the holster.

> He ordered the declarant to sit on a chair and declarant complied and when the FBI agent proceeded to handcuff both his hands, declarant threw himself against the FBI agent managing to throw him down on the floor and declarant managed to set himself loose and then grabbed his Rohm .38 special caliber pistol that was on the floor. With this, he shot three rounds at the FBI agent named JOHN BAILEY from a distance of one and a half meters while he was still lying on the floor.

Echavarria did not independently know the names of the FBI agent he had shot or of the bank teller he had attempted to rob. This information was supplied by the FBI.

Echavarria was formally turned over to the FBI at the U.S.-Mexico border later in the day on June 27. He was processed at the FBI's office in El Paso. FBI agents then accompanied Echavarria on a flight from El Paso to Las Vegas. They were met at the airport by the Las Vegas Metropolitan Police, who took custody of Echavarria and booked him. FBI agents remained with Echavarria through the booking process.

Ten days after he was captured in Juarez, Echavarria was charged in Nevada with capital murder.

The FBI was deeply involved in developing witness testimony. FBI agents interviewed about a dozen witnesses, including the bank teller whom Echavarria had attempted to rob. An FBI agent was present when the teller was shown a photographic lineup. FBI agents interviewed Maria, Echavarria's former girlfriend. They also interviewed Maria's brother, who had disposed of two guns for Echavarria and had driven him to the Juarez airport.

The FBI also actively developed physical evidence. FBI agents executed a search warrant on the car that Gurry had driven as the getaway vehicle from the bank and that Echavarria had driven from Las Vegas to Juarez. Glass fragments and fingerprints recovered from the car were sent to the FBI laboratory in Washington, D.C., for analysis. An FBI fingerprint specialist matched Echavarria's prints to those found in the car. An FBI forensic geologist examined the glass fragments and matched them to glass from the

shattered door of the bank. An FBI ballistics expert analyzed a recovered .38 caliber revolver and matched it to bullets removed from Agent Bailey's body. An FBI language specialist translated Echavarria's confession from Spanish to English. FBI agents took the bank's camera film to have it developed at a lab. About half a dozen FBI agents were involved in the development of the film. FBI agents contacted officials at the First Interstate Bank of Nevada, where Gurry had an account. The agents were led to the bank by a deposit slip an FBI agent had found in Echavarria's wallet.

### B. FBI Investigation of the Nevada Trial Judge

Echavarria's case was assigned to Nevada District Judge Jack Lehman. Judge Lehman had been investigated several years earlier by Agent Bailey for corruption, fraud, and perjury. FBI documents describing the investigation were sealed by the federal district court. After soliciting the views of the parties and of the United States, we unsealed the documents in this court. The narrative that follows is based in part on the contents of the previously sealed documents.

According to the FBI documents, Agent Bailey received information in 1985 "that the state of Nevada was losing millions of dollars on low cost housing land being sold . . . by the Colorado River Commission (CRC)." The CRC was allegedly selling state-owned land for a fraction of its actual value, allowing the buyers to resell at substantial profits. Lehman was the Chairman of the CRC during the relevant time.

Agent Bailey opened a formal FBI investigation in 1986. Agent Bailey learned during the course of his investigation

that the CRC had sold a 120-acre parcel of land in Laughlin, Nevada, (the "Laughlin property") to developer John H. Midby in late 1983 or early 1984. Midby had bought the Laughlin property from the CRC for $2,500 per acre. At about the same time, another developer had paid $45,000 per acre for land immediately adjacent to the Laughlin property. The CRC had five commissioners. Lehman and Robert Bugbee were the two CRC commissioners who had supported Midby's bid for the Laughlin property from the beginning and whose view eventually prevailed in the CRC.

From 1980 to 1982, before making a bid on the Laughlin property, Midby had negotiated with the American Bank of Commerce for a lease of 5,000 square feet of commercial space that Midby owned and into which the bank wished to expand. Lehman and Bugbee were members of the bank's Board of Directors. Bugbee volunteered to lead the bank's lease negotiations with Midby. After being at a "standstill" over Midby's asking price of $1.05 to $1.15 per square foot, plus $165,000 in improvements to be paid for by the bank, Midby agreed to drop the price to $0.85 per square foot, plus only $80,000 to $90,000 to be paid for the improvements. Midby also provided an additional 1,000 square feet of space that would be rent-free for a year. The other board members at the bank were "pleasantly surprised at [Bugbee's] ability to negotiate with [Midby]." One of the bank's co-founders later "realized that something may very well have been amiss . . . ."

The FBI file compiled by Agent Bailey contained evidence that Lehman may have committed perjury in 1986 while testifying before the Nevada Gaming Control Board about the Midby lease. Lehman had testified under oath before the Board that he had "'[a]bsolutely nothing' to do

with negotiating the lease" between Midby and the bank. However, the FBI file contained three letters signed by Lehman—one in December 1980 and two in January 1981—in which Lehman discussed and negotiated terms of the Midby lease.

On August 31, 1987, after reviewing the FBI's file, the U.S. Attorney's Office for the District of Nevada declined to prosecute Lehman either for federal Hobbs Act violations or for perjury. It deemed the perjury charge to be "a matter for state prosecution." The next day, James Weller, the FBI Special Agent in Charge, wrote to William Maddox, the U.S. Attorney, concerning the documents showing that Lehman may have committed perjury. He wrote, "This office feels strongly that State officials should have access to these documents inasmuch as the alleged perjury took place before the Nevada Gaming Control Board." He wrote further, "This office intends to turn [the documents] over to the chairman of the Gaming Control Board who has expressed an intense interest in any information indicating a witness may have lied before the Gaming Control Board." Weller indicated that he would not make "[s]uch disclosure . . . until such time as you concur with this proposal and until such time as, pursuant to [Fed. R. of Crim. Proc.] 6(e), a United States District Court Judge so orders." In a handwritten internal FBI memorandum to the Special Agent in Charge, dated December 5, 1987, Agent Bailey wrote, "Following discussion with AUSA Meyer, it is recommended this matter be maintained as – Pending – until such time as the USA's office receives authority from D of J to present to a USDC Judge in Las Vegas to present state officials with evidence of perjury committed in state court with respect to Lehman and [redacted]."

On June 23, 1988, federal District Judge Lloyd George authorized the release of the documents to the Gaming Control Board and the Nevada Attorney General's Office. So far as the record reveals, no state charges were ever filed against Lehman. On October 5, 1990, Ronald Asher of the Gaming Control Board advised the FBI that "a review of their files failed to disclose any reference to Jack Lehman."

## C. Failure to Recuse

On September 17, 1990, before Echavarria's trial began, Judge Lehman held a conference call with the lead prosecutor, Chief Deputy District Attorney William Henry, and Gurry's counsel, David Wall. Wall stated in a sworn declaration:

> During my representation of Mr. Gurry, I learned that the FBI had conducted an investigation of the Colorado River Commission at a time when Judge Lehman was a member of the Commission. Prior to trial, I participated in a telephone conference call with Judge Lehman and one of the prosecutors, either Mr. Henry or Mr. Harmon.
>
> . . .
>
> Judge Lehman indicated during the conference call that a reporter had asked him whether he would recuse himself in the trial of Mr. Gurry and Mr. Echavarria due to Judge Lehman having been a member of the Colorado River Commission at the time it was investigated by the FBI. Judge Lehman asked

> if either party wanted to move to have the
> judge recuse himself.
>
> Neither I nor the prosecution asked that
> Judge Lehman recuse himself.

In an internal memorandum, Wall also noted that Judge
Lehman said that "his wife had been approached on 9/17/90
and told that Judge Lehman ought not to be presiding over the
case since it was Agent Bailey who had investigated actions
of Lehman on the Colorado River Commission prior to
Lehman's appointment as a District Judge." According to the
memorandum, "[B]oth Bill Henry and [Wall] indicated that
they did not believe that it was in any way harmful or
prejudicial." It appears from Wall's declaration and
memorandum that Judge Lehman did not fully explain to him
the nature and extent of the FBI's investigation.

On October 9, 1990, FBI agents met with Clark County
District Attorney Rex Bell and Chief Deputy DA Henry.
According to an FBI memorandum describing the meeting,
the agents provided information about the FBI's investigation
of Judge Lehman. The memorandum noted that "[t]he
purpose of providing this information was to advise the DA
and the prosecuting ADA of its existence [so] that they could
evaluate its impact for use by the defense counsel in court
and/or appeal motions based on due process and equal
protection considerations and claiming judicial bias." The
memorandum went on:

> ADA HENRY advised that defense counsel
> for CARLOS GURRY was aware of Judge
> LEHMAN's involvement with SA BAILEY
> on official business but he did not believe that

counsel for JOSE ECHAVARRIA had that information. *ADA HENRY said that he would suggest a chambers meeting to discuss this with all counsel present at the next court appearance.*

(Emphasis added.)

On October 17, the FBI wrote a follow-up memorandum summarizing the information it had compiled about Judge Lehman. In addition to information about the CRC, the bank, and Lehman's testimony before the Gaming Control Board, the memorandum described an allegedly fraudulent land sale to a group that included Lehman: The buying group did not participate in the fraud, but it allegedly "did not inform anyone of the fraud" and stood to "collect on title insurance as an innocent buyer once the fraud was divulged." The memorandum also described a complaint alleging that Lehman, acting for the CRC, extended a time limit for an airport project "so that another firm with whom Lehman had an interest could obtain the contract."

No "chambers meeting to discuss this with all counsel present," as contemplated in the memorandum describing the meeting between the FBI and the state prosecutors, ever took place. It is undisputed that Echavarria and his defense attorneys did not learn about the FBI's investigation of Judge Lehman until well after trial and sentencing.

## II.  Procedural History

Echavarria and Gurry were indicted on five counts—murder with use of a deadly weapon, conspiracy to commit robbery, burglary with intent to commit robbery,

attempted robbery with use of a deadly weapon, and escape with a dangerous weapon. They were tried together. After the hearing described above, Judge Lehman denied Echavarria's motion to suppress his confession. Echavarria was convicted on all five counts and was sentenced to death. Gurry was convicted on all counts except escape and was sentenced to life with the possibility of parole.

Before entry of judgment, Echavarria moved for a new trial based on, *inter alia*, juror misconduct. Judge Lehman threatened to file a bar complaint against Echavarria's counsel for interviewing jury members in connection with the motion. Judge Lehman then recused himself from hearing the motion. After a different judge denied the motion, Judge Lehman entered judgment sentencing Echavarria to death.

Echavarria appealed his conviction and sentence to the Nevada Supreme Court. He asserted a claim of actual judicial bias based on Judge Lehman's hostility to his counsel during trial. Echavarria argued that he was "deprive[d] . . . of a fundamentally fair trial" by "comments of the Court [that] went far beyond legal admonishments on points of law and took the form of enraged rebukes to counsel." Echavarria did not yet know of any connection between Judge Lehman and Agent Bailey.

The Nevada Supreme Court affirmed Echavarria's conviction and sentence. The Court did not specifically address Echavarria's actual judicial bias claim. After addressing a number of other claims in detail, it wrote at the end of its opinion, "We have carefully examined appellants' numerous other assignments of error and determine that they lack merit." The United States Supreme Court denied certiorari.

Echavarria's first state habeas petition was denied by Judge Lehman. The Nevada Supreme Court dismissed Echavarria's appeal and denied rehearing. Echavarria then filed a federal habeas petition *pro se*. After counsel was appointed and filed an amended petition, the federal district court allowed Echavarria to subpoena the FBI to obtain information about Agent Bailey's investigation. The district court then stayed Echavarria's federal habeas proceedings to allow him to present to the state court the evidence he discovered about the investigation.

Based on "the law of the case doctrine," the state district court denied Echavarria's second state habeas petition, in which he claimed "judicial bias" and "tortured confession." Echavarria then filed a third state habeas petition, which was also denied. Echavarria appealed the denial of both petitions to the Nevada Supreme Court. In his appeal, Echavarria distinguished his claim that "Judge Lehman's conduct evidences an actual bias" from a separate claim that Echavarria called "compensatory bias." In support of his "compensatory bias" claim, Echavarria cited a Fifth Circuit case that explained that "[p]resumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that the probability of actual bias . . . is too high to be constitutionally tolerable." *See Richardson v. Quarterman*, 537 F.3d 466, 475 (5th Cir. 2008) (internal quotation marks and citation omitted). He also cited a Seventh Circuit case that explained that due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. . . . [T]o perform its high function in the best way justice must satisfy the appearance of justice." *See Bracy v. Schomig*, 286 F.3d 406, 410–11 (7th Cir. 2002) (quoting *Offut v. United States*, 348 U.S. 11, 14

(1954)) (internal quotation marks omitted). Echavarria argued, "Judge Lehman's in court rulings in Mr. Echavarria's case can best be explained by a desire to appear as a law and order judge to Agent Bailey's employer." Echavarria's two trial counsel filed declarations stating that they would have moved to disqualify Judge Lehman if they had known about the investigation.

The Nevada Supreme Court denied Echavarria's appeal of the denial of his second and third state habeas petitions. The Court wrote, "Although it appears that Echavarria did not learn of Agent Bailey's investigation until well after trial, the incidents he identifies as evidence of judicial bias were largely raised on direct appeal and rejected summarily by this court." The Court characterized the information about Agent Bailey's investigation of Judge Lehman as "[n]ew information as to the source of the alleged bias." The court concluded that the new evidence was "not so significant as to persuade us to abandon the doctrine of the law of the case." The United States Supreme Court denied certiorari.

Echavarria returned to federal district court and filed a second amended habeas petition. In a written order, the district court denied claims based on allegedly invalid aggravating factors (Claim 2), allegedly improper jury instructions (Claims 7 and 12), an allegedly improper denial of an opportunity to investigate allegations of juror misconduct (Claim 9), alleged prosecutorial misconduct (Claim 11), and alleged cumulative error (Claim 15).

The federal district court granted relief based on Echavarria's claim of judicial bias (Claim 4). The court held that the Nevada Supreme Court had adjudicated Echavarria's claim of actual judicial bias on the merits, and had not

unreasonably applied United States Supreme Court case law in holding that Echavarria had not shown actual bias. However, the district court held that the Nevada Supreme Court had not adjudicated on the merits Echavarria's claim that there was an intolerable risk of judicial bias that "might lead" the "average man as a judge" to be biased. *See Tumey v. Ohio*, 273 U.S. 510, 532 (1927). The district court wrote:

> The Nevada Supreme Court did not consider whether there was unconstitutional implied judicial bias. Specifically, the Nevada Supreme Court did not consider whether the relationship between the trial judge, the FBI and the murdered FBI agent, and the FBI's involvement in the case would give rise to a possible temptation to the average judge to not hold the balance nice, clear and true.

Ruling *de novo* on what it called Echavarria's "implied judicial bias" claim, the district court held that Echavarria had established a violation of his right to due process. The court wrote:

> Four years before Echavarria's trial, the murder victim, FBI Agent Bailey, had conducted an investigation of serious fraud allegations concerning the trial judge. The trial judge was aware of that FBI investigation, as was the prosecution (and even counsel for Echavarria's co-defendant), but Echavarria was not informed of it. The FBI played an important part in investigating Agent Bailey's murder and in apprehending Echavarria. There was an issue in the case

regarding the treatment of Echavarria in Juarez, after his arrest was made through cooperation between the FBI and the police in Juarez. Several FBI agents testified, both at the evidentiary hearing regarding the admissibility of the statement given by Echavarria after his arrest in Juarez, and at trial. Under these circumstances, this Court concludes that there was a significant risk that an average judge would possibly be tempted to lean in favor of the prosecution or to potentially have an interest in the outcome of the case. For example, an average judge in this judge's position might be tempted to demonstrate a lack of bias by overcompensating and ruling in a manner to avoid any suggestion that the judge harbored ill will against the FBI, or against the FBI agent murder victim, for having conducted the investigation. Or, to give another example—keeping in mind that the inquiry is to be made "under a realistic appraisal of psychological tendencies and human weakness," [*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009)]—an average judge in this judge's position might be tempted to avoid rulings unfavorable to the FBI, or to the prosecution of the FBI agent's alleged murderer, in order to appease the FBI and avoid any further investigation. Either of these inclinations would have tended to lend bias and tip the scales against Echavarria.

> In this Court's view, it is an inescapable conclusion that the risk of bias on the part of the trial judge in this case was too high to allow confidence that the case was adjudicated fairly, by a neutral and detached arbiter, consistent with the Due Process Clause of the Federal Constitution.

(Internal citations omitted.)

The district court examined, but did not decide, Echavarria's claim that his confession had been obtained by torture and was therefore improperly admitted (Claim 3). The district court analyzed Claim 3 in detail, suggesting that it would have credited Echavarria's testimony that his confession had been obtained by torture, but the court "refrain[ed]" from deciding "whether Echavarria's Juarez confession was voluntarily given." The court wrote that it took this approach

> out of sensitivity to the interests of comity and federalism, and also considering the interest of judicial economy. . . . [T]his Court expects that the issue of the admissibility of Echavarria's Juarez confession may be revisited in state court, before Echavarria's retrial, in light of this Court's ruling that the trial judge, who previously ruled upon the admissibility of the Juarez confession, had an unconstitutional implied bias. Under these circumstances, the Court will abstain from ruling on Claim 3, and will, instead, deny the claim, without prejudice, as moot.

The district court granted habeas based on its ruling that Echavarria had shown that there was a constitutionally intolerable risk of judicial bias. It ordered that Nevada release or retry Echavarria, but stayed its judgment pending appeal. This appeal followed.

### III. Standard of Review

We review the district court's decision to grant the petition for habeas corpus *de novo*. *Crittenden v. Chappell*, 804 F.3d 998, 1006 (9th Cir. 2015). We review the district court's factual findings for clear error. *Id.*

### IV. Discussion

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness." *Id.* (emphasis added).

"[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias. In defining these standards the Court has asked whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) (internal citations omitted). The test does not require a showing of actual judicial bias, "though actual bias, if disclosed, no doubt would be grounds for appropriate relief."

*Id.* at 883. Rather, the test requires only a showing of an undue risk of bias, based on the psychological temptations affecting an "average judge." *Id.* at 881. For example, in concluding that there had been an undue risk of bias, the Supreme Court wrote:

> We conclude that Justice Embry's participation in this case violated appellant's due process rights . . . . We make clear that we are not required to decide whether in fact Justice Embry was influenced, but only whether sitting on the case then before the Supreme Court of Alabama "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." The Due Process Clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between the contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.'"

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986) (first elision added) (internal citations omitted). "The Constitution requires recusal where 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014) (quoting *Withrow*, 421 U.S. at 47).

Echavarria claims that there was a constitutionally intolerable risk of bias, based on FBI Agent Bailey's criminal investigation of Judge Lehman.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires us to give significant deference to the state court's last reasoned decision—here, the Nevada Supreme Court's decision on appeal from the denial of Echavarria's second and third state habeas petitions. *See* 28 U.S.C. § 2254(d). AEDPA deference applies to claims that were "adjudicated on the merits in State court proceedings." *Id.*; *see Lambert v. Blodgett*, 393 F.3d 943, 966 (9th Cir. 2004). An adjudication on the merits is a "decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Lambert*, 393 F.3d at 969 (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)). "Any federally reviewable claim that was not adjudicated on the merits in state court is reviewed de novo." *Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016). If a state court denies a federal claim without giving any explanation, we presume that the decision was an adjudication on the merits. *See Amado v. Gonzalez*, 758 F.3d 1119, 1131 (9th Cir. 2014). But if a state court gives an "explicit explanation of its own decision," we take the state court at its word. *James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013). "[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (footnote omitted).

Here, the Nevada Supreme Court's explanation of its decision on state habeas shows that it adjudicated only Echavarria's claim of actual bias. It did not adjudicate his distinct claim of risk of bias. When the Nevada Supreme Court was presented with Echavarria's claim of actual bias on direct appeal, there was no evidence in the record of Agent Bailey's criminal investigation of Judge Lehman. Later,

when presented in state habeas proceedings with evidence of Agent Bailey's investigation, the Nevada Supreme Court wrote:

> Echavarria raised a claim of judicial bias on direct appeal, arguing that the trial judge made numerous disparaging and embarrassing comments about counsel. Although it appears that Echavarria did not learn of Agent Bailey's investigation until well after trial, the incidents he identifies as evidence of judicial bias were largely raised on direct appeal and rejected summarily by this court. In his post-conviction petition, Echavarria merely refined this claim, contending that the genesis of the trial judge's bias was related to Agent Bailey's investigation of him. New information as to the source of the alleged bias is not so significant as to persuade us to abandon the doctrine of the law of the case.

(Internal citations omitted.)

By invoking the "law of the case" as the basis for its denial of state habeas, the Nevada Supreme Court made clear that it treated its prior decision as "decid[ing] the issue" of bias "explicitly or by necessary implication." *Dictor v. Creative Mgmt. Servs., LLC*, 223 P.3d 332, 334 (Nev. 2010). But on direct appeal, the Nevada Supreme Court had addressed only a claim of actual bias based on Judge Lehman's hostility in court towards Echavarria's counsel. The Nevada Supreme Court could not have addressed Echavarria's distinct and later-raised claim of risk of bias, based on Agent Bailey's investigation, because Echavarria

had made no such claim on direct appeal.  Indeed, at the time of his direct appeal, Echavarria had no knowledge of the investigation.

The Nevada Supreme Court's reasoning in denying Echavarria's second and third habeas petitions makes clear that it decided only "whether the judge [was] actually, subjectively biased." *Caperton*, 556 U.S. at 881.  Reviewing the denial of state habeas, the Nevada Supreme Court described the evidence of Agent Bailey's investigation as "[n]ew information as to the source of the alleged bias."  The Court deemed the new information insufficient because it did not convince the Court that Judge Lehman was actually biased.  But actual bias was not the issue in Echavarria's risk-of-bias claim.  A showing of a constitutionally intolerable risk of bias does not require proof of actual bias.  *Id.* at 883; *see also Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) ("[T]he Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present.").  Indeed, due process "may sometimes require recusal of judges who have no actual bias and who would do their very best to weigh the scales of justice equally."  *Hurles*, 752 F.3d at 789 (internal quotation marks and citation omitted).

The Nevada Supreme Court has made a similar error before.  In *Rippo v. Baker*, 137 S. Ct. 905 (2017) (per curiam), the Supreme Court "vacate[d] the Nevada Supreme Court's judgment because it applied the wrong legal standard" for a post-conviction claim of judicial bias.  *Id.* at 907.  The petitioner alleged that his trial judge was biased because the judge was the subject of an investigation involving the local district attorney's office and Las Vegas police department.  *Rippo v. State*, 368 P.3d 729, 743 (Nev.

2016) (per curiam), *vacated*, *Rippo v. Baker*, 137 S. Ct. 905 (2017) (per curiam). The Nevada Supreme Court had concluded, "Taking Rippo's allegations as true, there remains [n]o factual basis . . . for Rippo's argument that [the trial judge] was under pressure to accommodate the State or treat criminal defendants in state proceedings less favorably or that he was biased against Rippo because of the investigation and indictment." *Id.* at 744 (internal quotation marks omitted) (alterations in original). The United States Supreme Court explained that "[t]he Nevada Supreme Court did not ask the question our precedents require: whether, considering all the circumstances alleged, the risk of bias was too high to be constitutionally tolerable." *Rippo*, 137 S. Ct. at 907.

Here, rather than applying the wrong legal standard to a risk-of-bias claim, the Nevada Supreme Court never decided the claim. The district court was therefore correct to review the claim *de novo*. We, too, review it *de novo*. We must determine "whether the average judge in [Judge Lehman's] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 U.S. at 881. The rule is "stringent." *Hurles*, 752 F.3d at 789 (quoting *Murchison*, 359 U.S. at 136). It reaches "[e]very procedure which would offer a possible temptation to the average . . . judge to forget the burden of proof . . . or which might lead him not to hold the balance nice, clear and true between the State and the accused." *Id.* (quoting *Tumey*, 273 U.S. at 532). It also requires "a realistic appraisal of psychological tendencies and human weakness." *Id.* (quoting *Caperton*, 556 U.S. at 883–84).

Judge Lehman was well aware of the FBI's efforts to ensure Echavarria's conviction. The average judge in his

position would have understood the risk entailed in making rulings favorable to Echavarria. As detailed above, the FBI marshaled agents and resources from multiple offices and enlisted the assistance of the Mexican police. The FBI sent four agents to Echavarria's interrogation in Mexico. The FBI provided information used in the confession that Echavarria signed the next morning. FBI personnel later translated the confession into English for the prosecution. The FBI's involvement in the operation was so deep that Commandante Rubalcava, the deputy chief of the Mexican police in Juarez, later believed that he needed to "have a clearance" from the FBI in order to speak with Echavarria's counsel. After Echavarria confessed, FBI agents gathered and analyzed critical evidence to be used at trial—witnesses, fingerprints, ballistics, and even glass fragments evaluated by an FBI forensic geologist.

FBI agents testified at the suppression hearing in state court. At the conclusion of that hearing, Judge Lehman was required to choose between the FBI agents' account of the interrogation and Echavarria's. In all, twenty employees of the FBI testified during proceedings before Judge Lehman, many of them stressing the fact that Agent Bailey was an FBI agent.

During voir dire, the prosecution emphasized that "[t]he murder victim was a special agent with the Federal Bureau of Investigation." At trial, the prosecution began its opening statement the same way: "On[] the 25th of June, 1990, at about eleven forty-nine a.m., Special Agent John Bailey of the Federal Bureau of Investigation was inside the Security Pacific National Bank . . . . He was there on official business." In its closing argument, the prosecution reiterated, "It would be easy enough to, after all this time, . . . to forget

perhaps the very real reason we are all here and we're all doing this. The very real reason we're all here and we're all doing this is shown in State's exhibit number one, the photograph of Special Agent John Bailey of the Federal Bureau of Investigation."

Based on our *de novo* review, we hold that Echavarria's right to due process was violated. Indeed, on the facts before us, we would so hold even if we were addressing the question under the deferential standard of AEDPA. For an average judge in Judge Lehman's position there would have been a constitutionally intolerable risk of bias. An average judge in that position would have feared that rulings favoring Echavarria, tipping the outcome towards acquittal or a sentence less than death, could cost him his reputation, his judgeship, and possibly his liberty.

The State argues that there was no risk of bias because federal and state authorities had previously declined to prosecute Judge Lehman. But the question before us is not whether, a few years before Echavarria's trial, Judge Lehman had escaped prosecution. The question is whether an average judge in Judge Lehman's position would have feared that the FBI might reopen its investigation or renew its advocacy for state prosecution if he made rulings favorable to Echavarria.

The State also argues that Judge Lehman's risk of bias was no different from that of "judges at all levels of the judicial system [who] are constantly asked to make rulings that could cut against the interests of state and federal law enforcement agencies." That is plainly incorrect. Judge Lehman was no ordinary judge, and Echavarria was no ordinary defendant. Rather, Judge Lehman personally had been criminally investigated by the very FBI agent that

Echavarria was accused of killing, and the case required Judge Lehman to determine, *inter alia*, whether FBI agents had known about or been involved in the use of torture in obtaining Echavarria's confession.

In the circumstances of this case, the risk of bias was extraordinary in both its nature and severity. The risk was obvious to all who had complete information about Agent Bailey's investigation. The FBI met with the prosecutors specifically to brief them on Agent Bailey's investigation and prepare them for "in court and/or appeal motions based on due process and equal protection considerations *and claiming judicial bias*." (Emphasis added.) Based on what was revealed in that meeting, the prosecutors appear to have recognized the importance of informing Echavarria of the investigation. Indeed, Chief Deputy District Attorney Henry promised to "suggest a chambers meeting to discuss this with all counsel present." But that meeting never took place, and Echavarria never had the opportunity to request that Judge Lehman recuse.

## Conclusion

The risk of bias in this case deprived Echavarria of the fair tribunal to which he was constitutionally entitled. We therefore affirm the district court's grant of habeas relief. Because we affirm the district court on this ground, we do not reach the other questions presented in this appeal.

**AFFIRMED.**