**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFFREY NIELSEN; BRIAN BOUDREAU, on behalf of themselves and all others similarly situated; ARIZONA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, as an organization and on behalf of its members, | No. 22-15302 D.C. No. 2:20-cv-01182-DLR-JZB |
| *Plaintiffs-Appellants*, | |
| v. | ORDER AND AMENDED OPINION |
| RYAN THORNELL, Director, Arizona Department of Corrections, Rehabilitation & Reentry, in his official capacity, | |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted May 15, 2023
Phoenix, Arizona

Filed May 21, 2024
Amended July 8, 2024

Before:  Jacqueline H. Nguyen, Daniel P. Collins, and
Kenneth K. Lee, Circuit Judges.

Order;
Opinion by Judge Lee;
Concurrence by Judge Nguyen;
Dissent by Judge Collins

## SUMMARY[*]

### Prisoner Civil Rights

The panel filed (1) an order denying a petition for panel rehearing and rehearing en banc and amending Judge Collins's dissent, and (2) an opinion affirming the district court's dismissal of an action brought by the NAACP's Arizona chapter and two former prisoners challenging the constitutionality of private prisons, specifically alleging that private prisons, motivated by profit, cut costs resulting in diminished safety and security as well as reduced programming and services.

The panel held that it had jurisdiction over the appeal because the NAACP adequately established organizational standing at the pleading stage, and Arizona chose not to seek

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

limited jurisdictional discovery under Rule 12(b)(1) to rebut the NAACP's broad standing allegations.

Addressing plaintiffs' procedural due process challenges, inmates do not have a protected liberty interest in avoiding private prisons because such prisons do not impose an "atypical or significant hardship" beyond ordinary prison conditions. Moreover, plaintiffs' speculative inferences failed to plausibly allege that private prisons have a financial incentive to keep prisoners incarcerated longer and that they do so by manipulating disciplinary proceedings. Arizona law expressly bars private prisons from disciplining prisoners or making decisions affecting their sentence credits or release dates, and plaintiffs' complaint provided no factual allegations that plausibly suggested that private prison employees defy this law.

The Thirteenth Amendment does not prohibit incarceration in a private prison. The Amendment does not forbid prison labor requirements, and incarceration in a private prison does not remotely approximate chattel slavery.

Plaintiffs failed to plausibly allege that confinement in a private prison violates the Eighth Amendment. Inchoate allegations of an intangible offense to dignity—at least as asserted here— could not support an Eighth Amendment claim, and plaintiffs failed to establish that incarceration in a private prison poses a serious threat to prisoners' physical well-being.

Finally, the Fourteenth Amendment's Due Process and Equal Protection Clauses do not prohibit incarceration in a private prison. Plaintiffs cannot not establish that a right against confinement in a private prison is deeply rooted in

this nation's historical tradition nor that Arizona's private prison system discriminates against a suspect class. Applying rational basis scrutiny, Arizona has a legitimate interest in increasing the efficiency of its operations, and privatization is a rational attempt to achieve this goal.

Concurring in the judgment, Judge Nguyen agreed that plaintiffs' constitutional challenge to Arizona's private prison scheme fell short. She wrote separately to emphasize that the panel's decision is limited only to the deficiencies in this particular case and did not decide whether every use of private prisons necessarily passes constitutional muster.

Dissenting, Judge Collins wrote that the operative complaint fails to establish that NAACP's Arizona chapter has either direct organizational standing on its own behalf or representational standing on behalf of others, and that the claims of the putative class representatives were moot. Accordingly, the panel lacked jurisdiction to reach the merits. Judge Collins would vacate the district court's judgment and remand with instructions to consider whether to allow amendment of the complaint to cure this jurisdictional deficiency.

## COUNSEL

John R. Dacey (argued) and Robert E. Craig, III, Abolish Private Prisons, Phoenix, Arizona; Lousene Hoppe, Fredrikson & Byron PA, Minneapolis, Minnesota; Thomas A. Zlaket, Thomas A. Zlaket PLLC, Tucson, Arizona; for Plaintiffs-Appellants.

Nicholas D. Acedo (argued), Rachel Love, and Daniel P. Struck, Struck Love Bojanowski & Acedo PLC, Chandler, Arizona, for Defendant-Appellee.

Lourdes Rosado and Andrew Case, LatinoJustice PRLDEF, New York, New York, for Amicus Curiae LatinoJustice PRLDEF.

Andre Douglas Pond Cummings, University of Arkansas at Little Rock, William H. Bowen School of Law, Little Rock, Arkansas, for Amicus Curiae University of Arkansas at Little Rock Law Professors and Graduates.

Roger A. Burrell, Bayham Jerman, Phoenix, Arizona, for Amici Curiae Notre Dame Center for Social Concerns, Faith in Action, Network Lobby, George Enderle, and Michael Hebbeler

Kari Hong, Florence Immigrant & Refugee Rights Project, Tucson, Arizona; Mark R. Conrad, Liz Kim, and William J. Cooper, Conrad Metlitzky Kane LLP, San Francisco, California; for Amici Curiae Florence Immigrant & Refugee Rights Project and American Immigration Lawyers Association, Arizona Chapter.

Erin P. Polly, K&L Gates LLP, Nashville, Tennessee, for Amicus Curiae The Day 1 Alliance.

**ORDER**

The dissenting opinion of Judge Collins is amended by adding the following language at the end of the first full paragraph on page 34 of the slip opinion:

> Likewise inadequate is AZ NAACP's barebones assertion, in a declaration filed in the district court, that two unidentified members of AZ NAACP were then incarcerated in a private prison.

An amended version of the dissent, reflecting this change, accompanies this order. The majority opinion remains unchanged.

Judge Nguyen and Judge Lee have voted to deny the petition for panel rehearing. Judge Collins has voted to grant the petition for panel rehearing because, in his view, the standing analysis relied upon by the majority is plainly incorrect in light of *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The panel has unanimously voted to deny the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for panel rehearing and the petition for rehearing en banc are **DENIED**.

**OPINION**

LEE, Circuit Judge:

Arizona, like many other states, relies on privately run prisons to house some of its inmates. The NAACP's

Arizona chapter and two former prisoners challenge the constitutionality of private prisons, alleging that their profit-motivated mission makes them less safe and secure than state-run prisons. While there may be compelling policy reasons against—or for—private prisons, there can be little debate that private prisons pass constitutional muster.

Inmates do not have a protected liberty interest in avoiding private prisons because such prisons do not impose an "atypical or significant hardship" beyond ordinary prison conditions. Nor do the plaintiffs have a valid Thirteenth Amendment claim based on involuntary servitude because the Amendment expressly carves out an exception for "punishment for crime." And their cruel and unusual punishment claim fails, too, because the Eighth Amendment does not cover the type of intrusions into prisoners' "dignity" as alleged in this case. Finally, inmates do not have a fundamental right to be free from alleged commodification in private prisons.

In sum, the Constitution does not prohibit states from turning to private companies to help run their correctional systems. The plaintiffs' arguments are better directed to Arizona's representatives and the citizens who elect them—not the courts. We affirm the district court's dismissal of the lawsuit.

## BACKGROUND

Arizona law allows the state to contract with private companies to operate prisons. Ariz. Rev. Stat. Ann. § 41-1609(B). By law, these contracts must provide "cost savings" to Arizona's taxpayers. *Id.* § 41-1609.01(G). And today, about one-fifth of Arizona's inmates reside in privately run prisons. For those inmates housed in private prisons, Arizona has established regulatory guardrails to

ensure adequate care.  By statute, private prisons must offer "a level and quality of services that are at least functionally equal to those that would be provided" by state-run facilities. *Id.* § 41-1609.01(H).  Private prisons also cannot discipline prisoners or make decisions influencing prisoners' sentence credits or release dates.  *Id.* § 41-1609.01(M).

The Arizona State Conference of the NAACP challenges Arizona's private prison system, along with two former prisoners who sue on behalf of a putative class of prisoners who are or may be incarcerated in private facilities.  They maintain that this system is unconstitutional.  They allege that private prisons are inferior to state-run prisons because they are motivated by profit, leading them to cut costs and resulting in diminished safety and security as well as reduced programming and services.  The plaintiffs also contend that private prisons have a financial incentive to keep prisoners incarcerated longer, which they accomplish by manipulating disciplinary proceedings.  And the plaintiffs urge that incarceration in a private prison commodifies prisoners, depriving them of dignity.

The district court granted Arizona's motion to dismiss the plaintiffs' suit for failure to state a claim.  The plaintiffs appeal from this order.

**STANDARD OF REVIEW**

We review de novo a district court's dismissal for failure to state a claim.  *See Sampson v. City of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020).  This review is more searching than a perfunctory rubber stamp—to survive dismissal, a complaint must be more than "merely consistent with" liability.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Instead, it must "nudge[]" the plaintiff's claims "across the line from conceivable to plausible," *id.* at 570,

meaning that it must allege facts that present "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If an innocent explanation for the allegations is more likely, the complaint does not plausibly state a claim for relief.  *See id.* at 681.  And of course, we discount conclusory allegations in a complaint because they are "not entitled to the assumption of truth."  *Id.* at 679.

## ANALYSIS

### I.  We have jurisdiction to decide this appeal.

At this stage of the litigation, the NAACP has adequately established that it has organizational standing to bring suit.[1] Article III allows an organization to sue in its own right if it can allege a sufficient "personal stake in the outcome of the controversy."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)).  We have thus recognized that an organization has "direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).  But this frustration must amount to a "concrete and demonstrable injury to the organization's activities," not "simply a setback to [its] abstract social interests."  *Havens Realty*, 455 U.S. at 379.

When we assess organizational standing, we must vigilantly examine the breadth of the group's mission to

---

[1] Because we hold that the NAACP has standing, we need not address whether the claims of the individual plaintiffs (who have been released from prison since they sued) are moot.

ensure that the organization maintains a genuine and demonstrable commitment to that mission—independent of the lawsuit that it seeks to bring. *See Sabra*, 44 F.4th at 879–80. Courts must remain wary of sprawling or multipronged mission statements that would allow an organization to have near limitless standing to sue. Otherwise, we run the risk of allowing organizations to bootstrap almost any politically fraught case onto their expansive mission statement and race to the courthouse, whether or not their lawsuit bears any significant connection to their actual activities. That is precisely the outcome that Article III seeks to avoid. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

We have thus found standing if a substantial and clear connection exists between the lawsuit and the organization's guiding objectives.**[2]** But an organization cannot

---

[2] Our case law often has not explained in detail what types of organizational activities in response to a defendant's action constitute an Article III injury under *Havens Realty*. Most recently, we reiterated that "an organization may not manufacture an injury by choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 683 (9th Cir. 2023) (en banc) (citations and internal quotation marks omitted). That language suggests that an organization's mere desire to act (and in the process spend resources) to oppose a policy cannot confer standing to challenge that policy. On the other hand, we held in *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*—though without detailed analysis—that an organization had standing because the complaint alleged that it had to "divert [its] resources to create a campaign correcting the Islamophobic information in [a teacher's] course materials." 44 F.4th 867, 887 (9th Cir. 2022). Here, the complaint similarly alleges, among other things, that NAACP has expended resources "educating the public about the harms and failures of private-for-profit prisons." The dissent parses the record and briefing in *Sabra* to factually distinguish that case from ours and reconciles our

manufacture standing merely by defining its mission with hydra-like or extremely broad aspirational goals such as "vindicating constitutional rights" or "ensuring equality." Otherwise, Article III standing would be severely eroded as it would sweep in almost any case and allow a party to "manufacture an injury" in virtually any case "by choosing to spend money fixing a problem" that genuinely "would not affect the organization." *Fellowship of Christian Athletes*, 82 F.4th at 683. An organization with such a broad mission would have to show a more tangible and significant connection to the case. For example, that organization could show that it had repeatedly devoted significant resources and time on an issue substantially similar to the one raised in the lawsuit. And courts should take a hard look at an organization's proffered evidence of standing for groups with extremely broad or multipronged missions.

That said, a plaintiff's burden to establish standing progresses "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Meland v. Weber*, 2 F.4th 838, 843 (9th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Thus, "general factual allegations" may suffice to establish standing at the pleading stage of a lawsuit, even though broad allegations would be inadequate at later stages,

---

case law based on those factual distinctions. Its point is well-taken. But we are at the pleading stage when we construe complaints liberally—and Arizona chose not to conduct limited jurisdictional discovery into Article III standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Given the virtually identical allegations in the complaints in this case and in *Sabra* as well as the procedural posture of our case, NAACP has shown standing at this stage.

when plaintiffs must prove specific facts. *Lujan*, 504 U.S. at 561.

In this case, the NAACP frames its mission extremely expansively: it defines it as "ensur[ing] equal protection under law for all persons, particularly African Americans, and in particular for persons in the criminal justice system, including those persons in private-for-profit prisons." This mission could cover practically any subject—education, housing, criminal justice, economic development, and so on—so long as it might be framed as implicating equal protection. And so this sweeping allegation might well be insufficient to support the NAACP's standing at a later stage of litigation when it would bear the burden of marshalling specific facts to prove that ending prison privatization is in fact one of its central missions. *See WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1215–16 (9th Cir. 2023). For example, it might have to show that it has devoted substantial resources to this objective or that the public clearly recognizes that goal as a central mission of that organization.

But this case has not passed beyond the pleading stage, and Arizona has chosen not to seek limited jurisdictional discovery under Rule 12(b)(1) to rebut the NAACP's broad standing allegations. *See Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1049 (9th Cir. 2023). Given this procedural posture, the NAACP's allegations establish organizational standing at this stage. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1037, 1040 (9th Cir. 2015).

## II. The plaintiffs have not plausibly alleged that incarceration in private prisons violates prisoners' procedural due process rights.

The plaintiffs bring two procedural due process challenges to Arizona's private prison system:  First, they maintain that prisoners have a protected liberty interest in avoiding incarceration at a private facility.  Second, they contend that private prison employees are biased by a desire to shore up their employer's bottom line, leading them to make disciplinary decisions that keep prisoners incarcerated for longer. The plaintiffs' complaint does not plausibly allege facts that would support either claim.

### A. The plaintiffs have not plausibly alleged that prisoners have a protected liberty interest in avoiding placement at a private prison.

The Supreme Court has held that a prisoner has a liberty interest in avoiding a prison that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

But "atypical and significant hardship" is a high bar.  We have held that prisons pose such a hardship only where they confine prisoners to their cells for at least twenty-three hours a day and impose additional severe limitations on human contact. *See Johnson v. Ryan*, 55 F.4th 1167, 1197–98 (9th Cir. 2022); *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014); *Wilkinson*, 545 U.S. at 214, 223–24. Placements that pose an automatic bar to early release may also pose atypical and significant hardship, *see Wilkinson*, 545 U.S. at 224, but only where the placement necessarily affects a prisoner's eligibility for release rather than simply

increasing the likelihood that he will serve more time, *see Sandin*, 515 U.S. at 487.

The plaintiffs' complaint does not plausibly allege that assignment to a private prison in Arizona poses anything close to "atypical and significant hardship."  The complaint contains a variety of allegations that conditions at private prisons are worse than those at state-run prisons: it maintains that private prisons offer reduced "programs and services," impose "more lockdowns and restrictions on prisoners' freedoms," and have "higher levels of incident reporting, violence, [and] lockdowns."  It also alleges that prisoners in private prisons face longer terms of incarceration because they are disciplined more often, which affects their "early release time credits, the possibility of clemency, and release from custody."[3]

But the complaint lacks any allegation that private prisons deprive prisoners of meaningful interpersonal contact or that they confine prisoners to their cells for twenty-three hours per day—or anything approaching these restrictions.  *See Johnson*, 55 F.4th at 1197–98.  The complaint vaguely alleges that private prisons make decisions that can increase the time that inmates spend in prison, but it does not allege that placement at a private facility automatically disqualifies a prisoner from early release. *See Wilkinson*, 545 U.S. at 224; *Sandin*, 515 U.S. at 487.  In short, the complaint does not plausibly allege that prisoners have a protected liberty interest in avoiding a private prison.

---

[3] The complaint provides some studies that it argues support its allegations.  But this outdated evidence does not stem from Arizona's prison system and thus does little to shore up the plaintiffs' claims.

The plaintiffs' argument fails for a more fundamental reason as well. Conditions naturally vary from prison to prison within any correctional system, including between state-run prisons. Some may offer more programs and services than others; some may have a history of imposing more severe lockdowns because of disciplinary problems; and other facilities may have a higher rate of incident reporting for varying reasons. If we accepted the plaintiffs' argument, an inmate could challenge his term in any prison (including state-run prisons), asserting that another prison offers better conditions or more programs and services.

But the Constitution does not give prisoners a right to demand placement at their preferred facility. We decline the plaintiffs' invitation to meddle in "a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *See Johnson*, 55 F.4th at 1196 (quoting *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).

### B. The plaintiffs have not plausibly alleged that private prison employees face an undue risk of financial bias.

We have held that a person should not adjudicate a matter if he or she has "a direct, personal and substantial pecuniary interest" in it. *See Hurles v. Ryan*, 752 F.3d 768, 789 (9th Cir. 2014). More precisely, a person should refrain from deciding a matter if his or her interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *See Echavarria v. Filson*, 896 F.3d 1118, 1128 (9th Cir. 2018) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009)).

Here, the plaintiffs invoke a chain of speculative inferences to argue that private prison employees are biased in disciplinary proceedings: private prisons generate revenue based on the number of prisoners that they house; the longer the prisoners stay there, the more money the prison makes; private prison employees want to maximize their employer's profits; and thus these employees intentionally make disciplinary decisions that keep prisoners incarcerated longer and fatten their employer's bottom line.

But the complaint's vague and implausible allegations fall short of showing that private prison employees have a "direct, personal and substantial" interest in the outcome of any disciplinary determination. *See Hurles*, 752 F.3d at 789. The complaint provides no detail to bolster its assertion that private prison employees "act, at least in part, out of a desire to maintain the profitability of the corporation for whom they labor." Nor does the complaint identify any policy that provides any financial incentive for private prison employees to keep inmates incarcerated longer.

The plaintiffs' theory of rigged disciplinary decisions faces another hurdle: Arizona law expressly bars private prisons from disciplining prisoners or making decisions affecting their sentence credits or release dates. Ariz. Rev. Stat. Ann. § 41-1609.01(M). In face of this law, the complaint baldly asserts that "the operators of the Arizona private prisons—not [the state]—are the true decisionmakers" in disciplinary proceedings. But the complaint provides no factual allegations that plausibly suggest that private prison employees defy this law. Its conclusory assertion that employees are "vulnerable to pressure to violate or ignore rules in order to increase corporate profits," does not "nudge[]" the plaintiffs' theory

"across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

### III. The Thirteenth Amendment does not prohibit incarceration in a private prison.

The Thirteenth Amendment to the United States Constitution commands: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

The plaintiffs urge that incarceration in a private prison violates the Thirteenth Amendment in two ways: (1) private prisons require prisoners to work, and (2) private prisons profit from maintaining custody of prisoners, which the plaintiffs argue equates to slavery.

These arguments falter based on the Thirteenth Amendment's plain language. In the Punishment Clause— "except as a punishment for crime whereof the party shall have been duly convicted"—the Amendment expressly carves out incarceration. Thus, we have held that the Thirteenth Amendment does not forbid prison labor requirements. *See Serra v. Lappin*, 600 F.3d 1191, 1196 (9th Cir. 2010); *see also United States v. Kozminski*, 487 U.S. 931, 942 (1988).

And of course, incarceration in a private prison does not remotely approximate chattel slavery. When the Thirteenth Amendment was adopted, slavery meant not just "a system of exploitive labor" but "a system of treating people like property" that could be bought and sold. *See* Paul Finkelman, *Slavery in the United States: Persons or Property?*, *in The Legal Understanding of Slavery* 105, 133

(Jean Allain ed., 2012). Convicted prisoners assigned to a private prison have not been relegated to such a position of dehumanizing subordination. Private prisons do not own prisoners. Nor do they buy or sell prisoners; instead, the State of Arizona determines where prisoners are incarcerated.

## IV. The Eighth Amendment does not prohibit incarceration in a private prison.

The Supreme Court has held that conditions of a prisoner's confinement "are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). "The Constitution 'does not mandate comfortable prisons,'" *id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), and "conditions of confinement may be, and often are, restrictive and harsh," *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Still, the Eighth Amendment prohibits "the wanton and unnecessary infliction of pain." *Id.* (quoting *Rhodes*, 452 U.S. at 347).

To run afoul of this prohibition, prison conditions must typically imperil prisoners' physical health or safety. *See id.*; *Farmer*, 511 U.S. at 832. True, in *Overton v. Bazzetta*, 539 U.S. 126 (2003), the Supreme Court did not explicitly foreclose the possibility that conditions causing severe emotional suffering—such as a permanent ban on visitation—might constitute an Eighth Amendment violation. *Id.* at 137. But *Overton* still grounded its analysis in a concern for prisoners' physical well-being, determining that a years-long ban on visitation did not contravene the Eighth Amendment because it did not "deprive inmates of basic necessities," "fail to protect their health or safety," or "involve the infliction of pain or injury." *Id.*

Here, the plaintiffs have not plausibly alleged that confinement in a private prison violates the Eighth Amendment. Their primary contention—that private prisons are unconstitutional because they commodify prisoners—is supported only by the complaint's allegation that incarceration in a private prison is "personally degrading and dehumanizing" and that it "violates each plaintiff's human dignity." But even if severe emotional suffering could constitute an Eighth Amendment violation, the plaintiffs' vague allegations of humiliation do not plausibly rise to this level. *See id.* Inchoate allegations of an intangible offense to dignity—at least as asserted here—cannot support an Eighth Amendment claim.

The plaintiffs' alternative argument—that inferior conditions in private prisons violate the Eighth Amendment—fares no better. Because the plaintiffs have not plausibly alleged that conditions in private prisons constitute "a dramatic departure from accepted standards for conditions of confinement," *id.* (citing *Sandin*, 515 U.S. at 485); *supra* Part II.A, they cannot establish that incarceration in a private prison poses a serious threat to prisoners' physical well-being. *See Farmer*, 511 U.S. at 834.

Finally, the plaintiffs gesture at evidence of social opposition to prison privatization to save their Eighth Amendment argument. Courts have sometimes inquired into "objective indicia of society's standards" when a plaintiff challenges a sentence as categorically disproportionate for a certain crime or a type of offender. *Graham v. Florida*, 560 U.S. 48, 60–62 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005)). But that inquiry is inappropriate here. In a conditions-of-confinement case like this one, evidence of social opposition to a form of incarceration cannot establish an Eighth

Amendment violation absent plausible allegations that this type of incarceration seriously threatens prisoners' well-being. *See Farmer*, 511 U.S. at 832–34. So even if the plaintiffs can establish growing resistance to the use of private prisons, this evidence cannot overcome their basic failure to plausibly allege that private prisons impose cruel and unusual punishment.

## V. The Fourteenth Amendment's Equal Protection and Due Process Clauses do not prohibit incarceration in a private prison.

If a challenged law neither burdens a fundamental right nor discriminates against a suspect class, it is consistent with the Fourteenth Amendment so long as it is supported by a rational basis. *Pena v. Lindley*, 898 F.3d 969, 986 (9th Cir. 2018).

### A. The Constitution does not protect a fundamental right against incarceration in a private prison.

The Fourteenth Amendment's Due Process Clause protects fundamental rights that are "deeply rooted in [our] history and tradition" and "essential to our Nation's 'scheme of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022) (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019)). When we evaluate whether an asserted fundamental right meets this high bar, we take care to ensure that the right is narrowly defined. *See Washington v. Glucksberg*, 521 U.S. 702, 721–23 (1997); *Khachatryan v. Blinken*, 4 F.4th 841, 856 (9th Cir. 2021).

The plaintiffs contend that prisoners have a right "to be free from commodification." But at this level of generality, the right that they assert loses all substance. The abstraction

inherent in the concept of "commodification" makes it impossible to identify limitations of this right. In view of our responsibility to "exercise the utmost care whenever we are asked to break new ground" in recognizing a new fundamental right, *see Dobbs*, 142 S. Ct. at 2247 (quoting *Glucksberg*, 521 U.S. at 720), we cannot accept the plaintiffs' overbroad characterization. *See Khachatryan*, 4 F.4th at 856.

Instead, the right that the plaintiffs seek to establish is more appropriately defined as a right against incarceration in a private prison. At this more modest framing, the plaintiffs' argument must fail because they cannot establish that a right against confinement in a private prison is "deeply rooted" in this nation's historical tradition. *See Dobbs*, 142 S. Ct. at 2246 (quoting *Timbs*, 139 S. Ct. at 687). The Thirteenth Amendment cannot support a tradition against private prisons—its Punishment Clause makes clear that it does not extend to prisoners duly convicted of a crime. U.S. Const. amend. XIII, § 1. Nor does the plaintiffs' analogy to the discredited practice of convict leasing support a historical tradition against the use of private prisons. Although the nation's rejection of convict leasing may reflect a tradition against states making money from prisoners by leasing them out to work for private companies, this does not translate to a tradition against states outsourcing incarceration services by paying private companies to house prisoners.

At bottom, the plaintiffs present no evidence showing that our nation has a "deeply rooted" historical tradition against the use of private prisons—much less that prohibiting private prisons is "essential to our Nation's 'scheme of ordered liberty.'" *See Dobbs*, 142 S. Ct. at 2246 (quoting *Timbs*, 139 S. Ct. at 687).

## B. Arizona's private prison system does not discriminate against a suspect class.

The plaintiffs do not argue that prisoners incarcerated in a private prison constitute a suspect class protected by the Fourteenth Amendment's Equal Protection Clause. Instead, they urge us to follow the Supreme Court's approach in *Plyler v. Doe*, 457 U.S. 202 (1982), in which the Court applied a heightened form of scrutiny to a statute that prevented children of undocumented immigrants from receiving a free public education. *Id.* at 205, 223–24.

The Court, however, has never extended *Plyler* outside of its context. Nor will we here. The consideration motivating the *Plyler* Court's determination—the devastating "lifetime hardship" that the denial of public education would impose on innocent children "not accountable for their . . . status" as undocumented immigrants, *id.* at 223—is absent here. Arizona's private prison system only affects adults convicted of criminal conduct who are responsible for their status. And the plaintiffs have not plausibly alleged that incarceration in a private prison imposes any hardship beyond what ordinarily accompanies prison life—let alone a hardship like the lifelong "stigma of illiteracy" that denied the children in *Plyler* "the ability to live within the structure of our civic institutions" and "foreclose[d] any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." *See id.* Thus, the plaintiffs' analogy to *Plyler* fails, and we review Arizona's private prison system only for rational basis.

## C. A rational basis supports Arizona's private prison system.

A law that neither burdens a fundamental right nor discriminates against a suspect class satisfies the Fourteenth Amendment if it has "a rational relation to some legitimate end." *Pena*, 898 F.3d at 986 (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). Under this standard, the challenged statute need not "actually advance its stated purposes," so long as "the government could have had a legitimate reason for acting as it did." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1141 (9th Cir. 2011) (quoting *Currier v. Potter*, 379 F.3d 716, 732 (9th Cir. 2004)).

The legitimate state interest underlying Arizona's private prison system is clear. By its own terms, it furthers the goal of efficiency. *See* Ariz. Rev. Stat. Ann. § 41-1609.02(B) (requiring that a private prison "provide at least the same quality of services as this state at a lower cost or . . . services superior in quality . . . at essentially the same cost"). Arizona has a legitimate interest in increasing the efficiency of its operations, and privatization is a rational attempt to achieve this goal. *See* Edward Rubin, *The Possibilities and Limitations of Privatization*, 123 Harv. L. Rev. 890, 912 (2010) (book review). Thus, a rational basis supports Arizona's private prison system whether or not it leads to cost savings. *See Wright*, 665 F.3d at 1141.

## CONCLUSION

Each of the plaintiffs' challenges to Arizona's private prison system fails—either for lack of a cognizable legal theory or because the plaintiffs have failed to plausibly allege facts to support them. *See Woods v. U.S. Bank N.A.*,

831 F.3d 1159, 1162 (9th Cir. 2016).  We thus **AFFIRM** the district court's dismissal of the plaintiffs' claims.

---

NGUYEN, Circuit Judge, concurring in the judgment:

I agree that plaintiffs' constitutional challenge to Arizona's private prison scheme falls short, and therefore we must affirm the district court's dismissal of their claims.[1]  I write separately, however, to emphasize that our decision is limited only to the deficiencies in this particular case.  We do not decide whether every use of private prisons necessarily passes constitutional muster.  *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 386 (1981) ("[W]e sit to decide concrete cases and not abstract propositions of law. We decline to lay down a broad rule or series of rules to govern all conceivable future questions in this area, even

---

[1] While I agree with Judge Lee that the NAACP has standing, I disagree with his suggestion that organizational plaintiffs require extra scrutiny. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("In determining whether [an organization] has standing . . . , we conduct the same inquiry as in the case of an individual.").  An organizational plaintiff need not "show that it . . . repeatedly devoted significant resources and time on an issue substantially similar to the one raised in the lawsuit." Lee Op. at 11.  "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Isaacson v. Mayes*, 84 F.4th 1089, 1096 (9th Cir. 2023) (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464, (2017)).  And, of course, monetary loss is not the only type of harm that will constitute an injury in fact. *See Sanchez v. L.A. Dep't of Transp.*, 39 F.4th 548, 554 (9th Cir. 2022) ("[I]ntangible harms can also be concrete." (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021))).  Nor is there anything inherently problematic about an organization having "sprawling or multipronged mission statements." Lee Op. at 10.  Many large organizations such as the NAACP advocate on—and thus have a stake in—a variety of issues.

were we able to do so."). Other inmates in private prisons may be able to allege viable constitutional claims, and we do not prejudge them.

Notwithstanding plaintiffs' failure here to state a "structural bias" claim, a state's private prison scheme in theory could lead to such a biased decisionmaking process that it denies inmates due process. Prison officials, like other administrative prosecutors, must be "accorded wide discretion" and "need not be entirely 'neutral and detached.'" *Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 572–73 (9th Cir. 2018) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980)). But we "should be chary of schemes that inject 'a personal interest, financial or otherwise, into the enforcement process [and] may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.'" *Id.* at 573 (quoting *Marshall*, 446 U.S. at 249–50).

Here, as Judge Lee explains, Arizona incorporates certain statutory guardrails into its private prison scheme to ameliorate conflict of interest concerns. Although private prison contracts must provide the state "cost savings," Ariz. Rev. Stat. Ann. § 41-1609.01(G), they must also provide "a level and quality of services" equaling or surpassing what the state would otherwise provide, *id.* § 41-1609.01(H). In addition, private prison contracts may not authorize prison operators to control inmate custody classifications or release dates—either directly or indirectly. *See id.* § 41-1609.01(M) (prohibiting contracts that allow private prison operators to "calculat[e] inmate release dates," "calculat[e] and award[] sentence credits," "[a]pprov[e] the type of work inmates may perform," or "tak[e] any disciplinary actions"). And to better align incentives, prison contractors must self-insure against "civil rights claims and liabilities," *id.* § 41-

1609.01(K)(2), and waive any defense based on sovereign immunity, *id.* § 41-1609.01(L).

Plaintiffs allege that despite these protections, inmates in Arizona's private prisons "experience greater deprivations of liberty" due to "higher levels of incident reporting" than in state-run prisons. According to plaintiffs, private prisons have an incentive to over-report inmate misconduct because Arizona "pays a predetermined . . . rate to each prison corporation for each day each prisoner occupies a cell or bed in a private prison," and an inmate "generates more revenue and profit to a private prison corporation the longer the prisoner remains in the private prison."

Plaintiffs' general allegations that private prisons result in greater deprivation of liberty raise serious due process concern. A financial incentive to prolong prisoners' incarceration could pressure private prison staff to embellish or even fabricate charges of inmate misconduct so that inmates would lose good time credit. *See* Ariz. Rev. Stat. Ann. §§ 41-1604.06, .07 (Arizona's good time credit scheme); *cf. Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987) ("[P]rosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses . . . , and whether any individuals should be granted immunity.").

Plaintiffs' theory, however, has several inferential gaps. To begin with, plaintiffs assert only that private prison staff report incidents of inmate misconduct at higher rates—not

that they embellish or fabricate the incidents. Without more, private prison employees' greater vigilance in reporting inmate misconduct does not in and of itself violate inmates' due process rights. Plaintiffs also fail to explain why individual correctional officers—as distinguished from the corporations employing them—are incentivized to over-charge inmate misconduct.

Moreover, plaintiffs' structural bias theory rests on the unstated assumption that the state-employed officials adjudicating charges of inmate misconduct are unwilling or unable to distinguish legitimately brought charges from false or exaggerated charges. Plaintiffs do not allege, for example, that inmate misconduct charges in Arizona's private prisons are sustained at a rate comparable to that in public prisons.[2] That might be true, but not necessarily. The state officials who adjudicate inmate misconduct charges lack a profit motive to sustain the charges; they may recognize and reject trumped up charges, thus serving as a bulwark against improperly motivated prison staff—as the Arizona scheme plainly contemplates.

Finally, while paying private prisons a flat fee per inmate-day might, without more, raise structural bias questions, plaintiffs allege additional nuances to the

---

[2] Plaintiffs' amended complaint includes evidence that federally contracted prison facilities "had . . . more guilty findings on serious inmate discipline charges" than the comparable Bureau of Prisons institutions, but plaintiffs do not explain why federally contracted prisons are comparable to Arizona's contract prisons simply because the same entities operate them. It is not clear whether employees of private federal prisons had the authority to discipline inmates—there is no federal counterpart to Arizona's statute prohibiting the outsourcing of prison discipline—and if they had such authority, it would explain the greater incidence of guilty findings.

compensation scheme that may temper any improper incentives. Plaintiffs claim that Arizona "guarantees specific volumes of prisoners for placement in private prisons." Crucially, however, plaintiffs do not claim that current occupancy rates meet or exceed the guaranteed minimums, which can be as high as 90–100%. If the occupancy rates aren't that high,[3] then private prisons may have disincentives to extend inmates' time in custody, since doing so would increase costs but not necessarily revenues.

For these reasons, I agree with Judge Lee that plaintiffs here fail to plausibly allege a structural bias claim.

I concur in the judgment.

COLLINS, Circuit Judge, dissenting:

We lack jurisdiction to reach the merits of this case in its present posture, because there is no plaintiff before us who has both Article III standing and live claims. Accordingly, I would vacate the district court's judgment and remand with instructions to consider whether to allow amendment of the complaint to cure this jurisdictional deficiency. To the extent that the majority holds otherwise, I respectfully dissent.

---

[3] The state asserts—and evidence attached to the amended complaint suggests—that the contractual minimums are not being met. Plaintiffs cite a study showing that Mississippi inmates in private prisons served a greater fraction of their sentences than those in state prisons, but the private prisons at issue had occupancy rates that exceeded the contractual minimums.

## I

The constitutional "doctrine of standing" sets forth certain irreducible requirements that are needed to establish that a matter is among "the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). In the case of an organizational plaintiff, the organization may attempt to make this three-part showing as to itself and its own operations, or it may seek to represent others as to whom it can make that showing. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 341–43 (1977).

The necessary elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the pleading stage, that requires an organizational plaintiff to plead sufficient facts to establish standing in accordance with the "pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1056 (9th Cir. 2023); *see also id*. at 1056 n.1.

The majority holds that Plaintiff Arizona State Conference of the National Association for the Advancement

of Colored People ("AZ NAACP") has alleged sufficient facts to establish its own *direct* Article III standing to bring this facial challenge to the constitutionality of the Arizona statutes that authorize private, for-profit companies to operate prison facilities within the State.[1]  *See* ARIZ. REV. STAT. § 41-1609, *et seq*.  I disagree.  In my view, the allegations of the operative complaint fail to establish that AZ NAACP has either direct organizational standing on its own behalf or representational standing on behalf of others.

## A

We have held that, under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), "[a]n organization has direct standing to sue where it establishes that the defendant's behavior [1] has frustrated its mission and [2] caused it to divert resources in response to that frustration of purpose." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 682 (9th Cir. 2023) (en banc) (citation omitted).  But as *Havens Realty* itself makes clear, the required frustration of the organization's "mission" by the defendant does *not* refer merely to a "setback to the organization's abstract social interests"; that is insufficient to establish standing.  *Havens Realty*, 455 U.S. at 379; *see also Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988) ("A mere interest in a problem, no matter how longstanding the interest and how qualified the plaintiff is in evaluating the problem, is not sufficient by itself to confer standing."

---

[1] Although Judge Nguyen disagrees with Judge Lee to the extent that he "suggest[s] that organizational plaintiffs require extra scrutiny," *see* Concur. at 24 n.1, she expresses no disagreement with Judge Lee's analysis as to why, even under his stricter standards, AZ NAACP has succeeded in alleging direct organizational standing here.  Accordingly, I construe Judge Lee's reasons for upholding AZ NAACP's standing allegations as reflecting the views of a majority of the panel.

(simplified)). Rather, the mission-frustration requirement entails a showing that the defendant's conduct affirmatively interfered with a particular set of *activities* in which the organization was engaged apart from, and prior to, the defendant's conduct. *See Fellowship*, 82 F.4th at 683 (noting that the national Fellowship organization was engaged in various activities to support its local chapters on school campuses, which carry out the national organization's work and goals); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002) (noting that the organizational plaintiff engaged in, *inter alia*, "investigat[ing] allegations of discrimination" and taking "steps" to "counteract and eliminate" any practices it uncovered); *see also Havens Realty*, 455 U.S. at 379 (noting that, prior to the defendant's conduct, the plaintiff organization was engaged in providing "counseling and referral services for low- and moderate-income homeseekers," and that the defendant's actions "perceptibly impaired" the organization's ability to provide those services).

We have made the same point, in somewhat different words, by stating that the required frustration of the organization's mission can be satisfied by a showing that the organization "'would have suffered some *other injury*' had [it] 'not diverted resources to counteracting the problem.'" *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879 (9th Cir. 2022) (emphasis added) (citation omitted). Although our opinions have sometimes applied *Havens Realty* in summary fashion, those decisions cannot properly be construed as eliminating, or failing to apply, this crucial requirement. *See*, *e.g.*, *Sabra*, 44 F.4th at 880 (affirming this requirement in a brief discussion that did not explicitly and specifically explain how it was met); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216,

1219 (9th Cir. 2012) (similar).  If this requirement did not exist, and the mere expenditure of resources in *response* to the defendant's conduct were *alone* enough, that would contravene our reaffirmation, in our recent en banc decision in *Fellowship*, that "an organization may not manufacture an injury by choosing to spend money fixing a problem that otherwise would not affect the organization at all."  82 F.3d at 682 (citations and internal quotation marks omitted).

Examined under these standards, AZ NAACP's allegations of standing fall short.  Most of the activities that AZ NAACP identifies in the complaint consist of pure advocacy in opposition to prison privatization—"lobbying" legislatures, appearing in "administrative proceedings" in opposition to private prisons, and "proposing and implementing" a "resolution to abolish private prisons."  But mere advocacy against a policy, and spending resources on such advocacy, is not enough under *Havens Realty* and its progeny.  If it were, any person who is opposed to any government policy would have standing to challenge that policy merely because the person has opposed such policies in the past and plans to spend money in the future against them.  That would allow parties both to "'manufacture' an injury," *Fellowship*, 82 F.4th at 683, and to predicate Article III jurisdiction on the vindication of their "abstract social interests," *Havens Realty*, 432 U.S. at 379.

To show that it was engaged in activities apart from the defendants' conduct that were harmed by that conduct (or that would be harmed by it absent a shifting of resources), AZ NAACP was required to plead facts establishing an injury beyond advocacy in *response* to Arizona's actions.  Thus, AZ NAACP had to show that, by instituting a system of private, for-profit prisons, Arizona has inflicted "concrete and demonstrable injury" to the organization's *already-*

*existing* activities. *Havens Realty*, 455 U.S. at 379. The complaint wholly fails to make any such showing. It instead states only that AZ NAACP "advocat[es] for persons in private-for-profit prisons." But that is merely an allegation of the self-inflicted injury of choosing, in response to Arizona's challenged conduct, to spend resources opposing it, and such purely voluntary, responsive activities are insufficient to establish standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding that, in the absence of some independent existing or impending harm, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves"). Rather, AZ NAACP had to show that, had it *not* undertaken to oppose Arizona's private-prison policies, it "would have suffered some other injury." *Sabra*, 44 F.4th at 879 (citation omitted). Nothing in the complaint here even attempted to make such a showing.

In concluding that AZ NAACP's standing allegations satisfy *Iqbal*'s pleading requirements, the majority relies on the premise that the allegations here are, in the relevant respects, "virtually identical" to the ones that we found sufficient in *Sabra*. *See* Opin. at 10–11 n.2. That is wrong.

In *Sabra*, a public community college offered a course that taught that "Islam as a religion . . . not only supports terrorism but requires it," and students who declined to endorse that view on a quiz were penalized for their "incorrect" answers. *Sabra*, 44 F.4th at 898, 902 (Bress, J., dissenting) (describing the facts in substantial detail). The college's course was then widely publicized, thereby creating a public perception that a public college promoted, and penalized opposition to, the view that Islam requires and endorses terrorism. *Id*. at 876. To "remedy the damage done," the Council on American-Islamic Relations of Arizona ("CAIR"), a "non-profit organization that advocates

for the civil rights of American Muslims," "contracted with a religious scholar to develop materials for a public-awareness campaign," thereby "diverting resources from the organization's usual advocacy activities." *Id*. at 873, 877.

Although, as the majority notes, *Sabra* contains no detailed analysis as to how CAIR satisfied the requirement to "show[] that [it] '*would have suffered some other injury*'" had [it] "not diverted resources to counteracting the problem," 44 F.4th at 879 (emphasis added) (citation omitted), we squarely held that there *was* "damage done" to CAIR by the college *before* CAIR expended resources to "remedy" that damage, *id*. at 877. Although we did not detail exactly what the damage was, it seems clear that we relied on the view that a public college's promotion and enforcement of the view that Islam requires terrorism "perceptibly impaired" CAIR's established and pre-existing educational efforts aimed at promoting a positive and non-violent public perception of Islam. *See* Appellants' Opening Brief in *Sabra*, 2021 WL 238698, at \*29–31 (describing CAIR's allegations concerning such pre-existing activities). Here, by contrast, there are no allegations of damage done by Arizona's private-prison program to pre-existing activities of AZ NAACP. Instead, AZ NAACP has pleaded that it has opposed adoption of private-prison policies in the past and then chose to expend resources when Arizona adopted such a policy. Article III requires more than that.

## B

I also conclude that AZ NAACP has failed to establish representational standing under *Hunt*.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. Although AZ NAACP invoked this representational standing doctrine in the complaint, there are no supporting factual allegations sufficient to raise a "plausible inference" that these requirements have been met. *See Iqbal*, 556 U.S. at 682. In particular, the complaint wholly fails to plead facts establishing that any of AZ NAACP's members would have standing to challenge prison privatization in Arizona in their own right. The complaint merely alleges, in conclusory terms, that some of its members "have been or will be directly harmed by prison privatization" and that it is "highly likely that some of its members or their family members will be incarcerated in private prisons." That is not enough to satisfy *Iqbal*'s pleading requirements. Likewise inadequate is AZ NAACP's barebones assertion, in a declaration filed in the district court, that two unidentified members of AZ NAACP were then incarcerated in a private prison.

Accordingly, I conclude that, in the operative complaint, AZ NAACP has failed to allege sufficient facts to establish its standing.

## II

The operative complaint in this case named two additional Plaintiffs, Jeffrey Nielsen and Brian Boudreau, who at that time were incarcerated in privately managed prisons in Arizona. Nielsen and Boudreau sought to represent a putative class consisting of "[a]ll prisoners of the Arizona Department of Corrections, Rehabilitation & Reentry who are or may be placed by the Department in a private prison for incarceration." However, no class was

ever certified before the district court dismissed this case, and both Nielsen and Boudreau have now been released from custody. In view of those facts, their claims are moot, even if one assumes *arguendo* that they had Article III standing at the time of the district court proceedings. That is, because the complaint seeks only prospective injunctive and declaratory relief, Nielsen's and Boudreau's release from custody renders their individual claims moot. *See Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) ("An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action.").

Nielsen and Boudreau contend that, even though no class was certified, their claims fall within a mootness exception for claims that are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011). This contention fails.

The Supreme Court has "held that a class action is not rendered moot when the named plaintiff's individual claim becomes moot *after* the class has been duly certified." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) (emphasis in original) (citing *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)). Accordingly, to invoke *Sosna*'s class-action-based mootness exception, a plaintiff ordinarily must satisfy "*Sosna*'s requirement that a named plaintiff with a live claim exist *at the time of class certification*." *United States v. Sanchez-Gomez*, 584 U.S. 381, 388 (2018) (emphasis added). However, there is a "limited exception" to this requirement, which "applies when the pace of litigation and the inherently transitory nature of the claims at

issue conspire to make that requirement difficult to fulfill." *Id*. This exception was first suggested in dicta in *Sosna*, where the Court acknowledged that "[t]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion." 419 U.S. at 402 n.11. In such cases, the Court stated, a certification order might be deemed to "'relate back' to the filing of the complaint" so as to prevent mootness. *Id*.

*Sosna*'s dicta became law one month later in *Gerstein v. Pugh*, 420 U.S. 103 (1975). *Gerstein* addressed "whether a person arrested and held for trial under a prosecutor's information is constitutionally entitled to a judicial determination of probable cause for pretrial restraint of liberty." *Gerstein*, 420 U.S. at 105. The named plaintiffs "were members of a class of persons detained without a judicial probable cause determination, but the record [did] not indicate whether any of them were still in custody awaiting trial when the District Court certified the class." *Id*. at 110 n.11. The Court observed that "[s]uch a showing ordinarily would be required to avoid mootness under *Sosna*," but it determined that the case was of the sort *Sosna* had indicated in dicta would warrant "relation back" of the certification order. *Id*. The Court explained:

> The length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial. It is by no means certain that any given individual, named as plaintiff, would be in

> pretrial custody long enough for a district
> judge to certify the class."

*Id*.; *see also Genesis*, 569 U.S. at 71 n.2 ("The 'relation back' doctrine [of *Gerstein*] was developed in the context of class actions under Rule 23 to address the circumstance in which a named plaintiff's claim becomes moot prior to the certification of the class."). In *Sanchez-Gomez*, the Court reaffirmed that the *Gerstein* exception rested on the distinctive "circumstance[]" that, in *Gerstein*, the Court "could not determine 'that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class.'" 584 U.S. at 386 (quoting *Gerstein*, 420 U.S. at 110 n.11).

Here, Nielsen and Boudreau do not fit within the *Gerstein* exception to *Sosna*'s requirements because there is nothing in the record to suggest that the type of claims at issue here are ones that are so short-lived that there is insufficient time to seek and obtain certification of the class in the district court. Here, the plaintiffs simply chose not to seek certification of the class before the motion to dismiss was resolved, but they certainly could have done so. *See, e.g.*, *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1269 (9th Cir. 2019) (noting that, "[w]hile Facebook's motion to dismiss was pending, the plaintiffs moved to certify a class" and that the district court denied the motion to dismiss and certified the class); *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1235 (9th Cir. 2001) (noting that the district court denied defendants' motion to dismiss, and certified a class, in the same order). This is not a case such as *Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020), in which we found *Gerstein*'s exception to be satisfied where the challenged collection of union dues expired, by its terms, in April 2019, *id*. at 946,

which was right around the time that the class certification motion was due under the district court's scheduling order. *See Belgau v. Inslee*, No. 18-cv-5620, Dkt. 42 (W.D. Wash. Nov. 15, 2018). In such circumstances, "full litigation" of the class certification issue in the district court is inherently impossible due to the very short "duration of the challenged action." *Belgau*, 975 F.3d at 949. Nothing comparable is alleged here, because Boudreau and Nielsen were released, respectively, in May 2022 and August 2022, nearly two years after this case was filed and well after this case was already on appeal.

Because this is not a situation in which the claims are so inherently transitory that they would not survive "long enough for a district judge to certify the class," *Sanchez-Gomez*, 584 U.S. at 386 (citation omitted), the *Gerstein* exception to *Sosna*'s requirements does not apply. Therefore, under *Sosna*, the claims of Nielsen and Boudreau would be saved from mootness only if the class was actually certified while they were still incarcerated in a private prison. *Id*. at 388. Because that requirement is not met here, their claims are moot.

## III

Because the NAACP has not sufficiently established its standing, and because the claims of the putative class representatives are moot, we lack jurisdiction to reach the merits. I would therefore vacate the district court's judgment without addressing the merits and would remand the matter. However, I would not remand for immediate dismissal for lack of jurisdiction, because I think that AZ NAACP should be given an opportunity to amend its complaint to add additional allegations of standing. That is particularly appropriate here because, until our recent decision in *Jones*

*v. L.A. Central Plaza*, 74 F.4th at 1056 n.1, there was some confusion in this circuit as to whether *Iqbal*'s pleading standards applied to jurisdictional issues such as Article III standing.  *See id.* (holding that Ninth Circuit precedent suggesting that *Iqbal* did not apply to jurisdictional issues has been abrogated by subsequent Supreme Court precedent).  Now that we have clarified that *Iqbal* does apply to the pleading of jurisdictional facts, AZ NAACP should be given an opportunity to amend its complaint in a way that might satisfy *Iqbal*'s standards.[2]

To the extent that the majority instead reaches the merits of the claims, I respectfully dissent.

---

[2] I express no view as to whether, on such a remand, additional individual plaintiffs with live claims could choose to join as co-plaintiffs in any such amended complaint of AZ NAACP.  *Cf. Kuahulu v. Employers Ins. of Wausau*, 557 F.2d 1334, 1337 (9th Cir. 1977) (holding, in a case with only a single individual plaintiff and no organizational co-plaintiff, that, "where the class was not certified before appellant's claim became moot," the court was "require[d] . . . to dismiss the entire appeal as moot," without remanding for substitution of a new class representative).